UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
NEW YORK
------------------------------------------------------
XTDR, LLC d/b/a SERVPRO PARK
CITY SHORELINE,

                Plaintiff,                  **MEMORANDUM AND ORDER**

      -against-                          14-CV-2157 (DRH)(SIL)

CITY OF LONG BEACH, NEW YORK,

                Defendant.
-----------------------------------------------------------X

**A P P E A R A N C E S :**

**For the Plaintiff:**
**MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP**
190 Willis Avenue
Mineola, NY 11501
By:    Loretta M. Gastwirth, Esq.

**DRESSMAN BENZIGER LAVELLE PSC**
221 East Fourth Street, Suite 2500
Cincinnati, OH 45202
By:    Kathleen Tranter, Esq.
        Kevin Hoskins, Esq.

**For the Defendant:**
**CITY OF LONG BEACH, OFFICE OF CORPORATION COUNSEL**
One West Chester Street
P.O Box 9002
Long Beach, NY 11561
By:    Robert M. Agostisi, Esq.

**HURLEY, Senior District Judge:**

       Plaintiff XTDR, LLC d/b/a Servpro Park City Shoreline ("plaintiff" or "Servpro")

commenced this action against defendant City of Long Beach ("defendant" or "Long

Beach" or "the City") asserting claims arising out of services that Servpro performed for

the City. Presently before the Court is defendant's motion for summary judgment pursuant to

1

Federal Rule of Civil Procedure 56 ("Rule 56") seeking dismissal of plaintiff's claims. For the reasons set forth below, Long Beach's motion is granted in part and denied in part.

*BACKGROUND*

The following facts, drawn from the parties' Local Rule 56.1 statements and submissions, are undisputed unless otherwise noted.

As a result of Superstorm Sandy, which struck Long Beach on October 29, 2012, Long Beach suffered severe and catastrophic damage. An influx of approximately four feet of water throughout the City caused approximately $100 million to $150 million in damages. In particular, the storm caused damage to the City's Ice Rink, Garage, Martin Luther King ("MLK") Center, and Senior Center ("the facilities"), the subjects of this lawsuit.

Servpro performs interior cleaning and restoration services. At some point after the storm, Patrick Carroll, Servpro's Chief Operating Officer at the time, (hereafter referred to as "COO Carroll" or "Carroll"), met with Long Beach officials to discuss cleanup. Servpro asserts that COO Carroll first met with Long Beach officials at the City's temporary command center on November 3, 2012 and at that time, provided Corey Klein, who was then Corporation Counsel for the City, (hereafter referred to as "Corporation Counsel Klein" or "Klein"), with a copy of Servpro's Time and Materials Rate Sheet. (Pl.'s R. 56.1 Counterstatement ¶ 18.) According to COO Carroll, on that date, James LaCarrubba, the Commissioner of the Department of Public Works ("DPW") for the City, (hereafter referred to as "Commissioner LaCarrubba" or "LaCarrubba") and Joseph Febrizio, the City's Deputy Commissioner of Public Works, (hereafter referred to as "Deputy Commissioner Febrizio" or "Febrizio") directed Servpro to go to the City Garage to begin performing work. COO Carroll testified that on November 3, 2012, Servpro went to the Garage and met with the manager. Carroll also

2

testified that Servpro worked at the Garage for two days and hired a third party vendor to remove all of the oil from the Garage's oil pit.

According to COO Carroll, also on November 3, 2012, Commissioner LaCarrubba and Deputy Commissioner Febrizio took Servpro representatives to the Ice Rink, and directed Servpro to remove all mud and standing water by the following morning. Carroll testified that while Servpro was cleaning the Ice Rink, he was approached by James Hodge ("Hodge"), who was employed by the City as a Water Distribution Worker, about inspecting another building and that the next day, Hodge led him to the MLK Center to do a walk-through of the facility. Carroll testified that after performing the walk-through, he met with Commissioner LaCarrubba and Deputy Commissioner Febrizio to obtain permission to begin work. Carroll also testified that LaCarrubba and Febrizio authorized him to commence work and instructed him to remove wet carpet and wet content from the MLK Center and to provide a generator to the facility.

On either November 9, 2012 or November 10, 2012, Carroll told Hodge that Servpro was no longer able to work because it had not received approval from someone authorized by the City. Hodge then made a telephone call, and Long Beach Councilman Len Torres (hereafter referred to as "Councilman Torres" or "Torres") came to the MLK Center. Councilman Torres presented a document to Eric Hunter (hereafter referred to as "Project Manager Hunter" or "Hunter"), Servpro's Project Manager. The document, printed on Torres's memo pad stationary stated: "This is to authorize[] preparation of MLK for C.O. certification. Re: James Hodge, J. LaCarrubba, J. Schnirman."

According to plaintiff, Deputy Commissioner Febrizio also directed Servpro to perform work at the Senior Center, and Servpro began work there on November 20, 2012. Plaintiff

3

claims that it worked at the Senior Center for a total of seven full days.

Also on November 20, 2012, Project Manager Hunter contacted Febrizio in an effort to execute a written contract between Servpro and Long Beach. Servpro attached its first proposed Emergency Services Agreement ("ESA") as well as a proposed scope of work for the City's Senior Center. The City never returned a signed copy of that agreement to Servpro. Later that day, Hunter provided Febrizio with a revised ESA that contained an amendment regarding prevailing wages and a payment schedule. It stated: "All projects have been determined NOT to fall under any local, state, or Federal Prevailing Wage Laws."

Additionally on November 20, 2012, the Long Beach City Council held its first meeting since Superstorm Sandy. At that meeting, the City Council adopted a resolution which declared a state of emergency within the City ("the Resolution"). The Resolution contained the following clause: "WHEREAS, the City Manager ordered that the Police Department, Fire Department, the Department of Public Works and the Office of Corporation Counsel were directed to take whatever steps necessary to protect the life and property, public infrastructure and provide such emergency assistance deemed necessary."

On November 23, 2012, Hunter provided another proposed ESA to Deputy Commissioner Febrizio. This time, the Amendment stated that the agreement was governed by New York State Prevailing Wage Laws (New York Labor Law § 230, a/k/a Article 9). Additionally, the Amendment included a wage table. However, the City never returned a signed copy of the November 23, 2012 ESA to Servpro.

According to the City, on December 14, 2014, it received three (3) competitive bids to perform cleaning, sanitizing and disinfecting of various City facilities, including the Senior Center, Ice Rink, and City Garage. Servpro claims, however, that these bids were not for the

4

emergency services it had already provided, but for additional work. On December 18, 2014, the City Council awarded the bid to JBH Environmental ("JBH") and a contract was executed between the City and JBH.

On January 15, 2015, Servpro sent the City four separate invoices in connection with work performed at the Senior Center, Ice Rink, Garage, and MLK Center for $27,527.84, $13,051.27, $31,097.83, and $211,413.80, respectively. The combined total of the invoices was $283,090.74. However, subsequently, Servpro issued a revised invoice listing a combined total of $343,149.40. Defendant claims that the invoice discrepancy is attributable to a New York State Department of Labor audit, which determined that XTDR employees had been unlawfully underpaid and Servpro was required to make the employees whole by paying them the prevailing wages. According to defendant, the revised invoice contained the amount of wages the audit required Servpro to pay.

Ultimately, JBH invoiced the City for the following amounts: $42,000 for the Ice Arena, $16,000 for the Senior Center, $55,000 for the Garage, and $12,652.50 for work done to clean up the MLK Center. The City paid these invoices in full.

## DISCUSSION

### I. *Applicable Law and Legal Standards*

Summary judgment pursuant to Rule 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude

5

the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc*., 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp*., 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts*,"* *Aslanidis v. U.S. Lines, Inc*., 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's

burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not implausible." *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587). "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford,* 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## II. *Plaintiff's Breach of Contract Claim*

To establish a breach of contract claim in New York, a plaintiff must show: "(1) the existence of an agreement, (2) adequate performance of the contract by plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). The City argues that plaintiff's breach of contract claim cannot survive because it cannot establish the existence of a contract between the parties.

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent, and intent to be bound." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009). Moreover, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Tractebel Energy Mktg. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) (internal quotation marks and citation omitted).

Here, Long Beach argues that there was no "mutual assent" between the parties, because of a "failure to show an agreement (written or otherwise) with respect to 'all material terms.' " (Def.'s Mem. in Supp. at 7.) Specifically, the City points out that it never signed or

7

returned any of the proposed ESAs. Additionally, the City argues that there was no mutual assent, as there was no agreement on material terms such as the amount of wages Servpro was to pay its employees and the price of its services.

Plaintiff does not dispute the absence of a signed ESA, but points to evidence suggesting that the City was aware of Servpro's rates from the time Servpro commenced work. Specifically, COO Carroll testified that he provided Servpro's rates to Corporation Counsel Klein on the first day he met with him as well as to Deputy Commissioner Febrizio and Commissioner LaCarrubba on November 8, 2012. (Pl.'s Ex. A, Carroll Dep. at 60.) Carroll also testified that on that day he sent an email to Febrizio comparing Servpro's rates with that of a competitor. (*Id*. at 61.) Based on this evidence, a reasonable factfinder could infer that the City had knowledge of Servpro's rates prior to the commencement of work on the facilities. Moreover, there is evidence that Commissioner LaCarrubba and Deputy Commissioner Febrizio had knowledge of the rates while directing Servpro to work at the facilities. This conduct along with Servpro's performance of services is sufficient to raise a genuine issue of material fact as to whether there was mutual assent between the parties. *See Design Partners, Inc. v. Five Star Electric Corp.*, 2016 WL 1258474, at *9 (E.D.N.Y. Mar. 29, 2016) (quoting *Action Temporaries Mgmt. Co. v. Stratmar Sys., Inc.*, 1996 WL 110170, at *2 (2d Cir. Mar. 12, 1996) ("Under New York law, 'the existence of a contract may be established through conduct of the parties recognizing the contract,' even if no 'final contract' has been signed by the parties."); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) ("The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which *evinces the intention of the parties to contract*." (internal quotation marks and citation omitted)).

*Whether the City Employees Had Authority to Enter into a Contract on Behalf of Long Beach*

Additionally, defendant argues that there was no valid contract because the City employees whom Servpro encountered did not have actual or apparent authority to enter into contracts on behalf of the City. It is well established that "a principal is liable to third parties for the acts of an agent operating within the scope of his real or apparent authority." *Citibank, N.A. v. Nyland (CF8) Ltd.,* 878 F.2d 620, 624 (2d Cir. 1989). "Under New York law, an agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly." *Highland Capital Mgmt. v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010). "Where an agent lacks actual authority, he may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists." *Id*. at 328. Accordingly, "[a]pparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997) (internal quotation marks and citations omitted). "Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into the transaction." *Wells Fargo Home Mortg., Inc. v. Hiddekel Church of God, Inc.*, 2004 WL 258144, at *6 (Sup. Ct. 2004) (internal quotation marks and citations omitted).

Plaintiff argues that pursuant to the Resolution, the Commissioner and Deputy Commissioner of the DPW, i.e., LaCarrubba and Febrizio, had actual authority to hire Servpro. Defendant, however, points out that "the language [of the Resolution] is silent on whether [it]

9

enabled LaCarrubba [or Febrizio] to sign contracts on behalf of the City." (Def.'s Mem. in Supp. at 22.) Moreover, it argues that the City Charter explicitly confers the power to enter into contracts on the City's behalf solely on the City Manager, and a Charter amendment would have been needed in order to confer this power on someone else.

Putting the issue of actual authority aside, however, there is at least a question of fact as to whether Commissioner LaCarrubba and Deputy Commissioner Febrizio had apparent authority to contract with Servpro. As noted above, the existence of apparent authority depends on words or conduct of the principal communicated to the third party and the third party's reasonable reliance on such words or conduct. Moreover, "A public authority is not bound by a declaration of its agent 'unless it manifestly appears that the agent was acting within the scope of his authority, or that he had been held out as having authority . . . .' " *Brookhaven Housing Coalition v. Solomon*, 583 F.2d 584, 591 (2d Cir. 1978) (quoting *Hawkins v. United States*, 96 U.S. 689, 691 (1872)); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 399 F. Supp. 2d 242, 248 (S.D.N.Y. 2005). To the extent plaintiff relies upon the Resolution as the City's words giving rise to apparent authority, defendant argues that the Resolution cannot establish apparent authority because Servpro admits that it was unaware of it and therefore could not have reasonably believed that it conferred authority on any of the City employees. (Def.'s R. 56.1 Stmt. ¶ 46.) However, plaintiff also argues that apparent authority existed as to Commissioner LaCarrubba and Deputy Commissioner Febrizio because "[o]n the first day of the project, [Corporation Counsel] Klein told Servpro that LaCarrubba and Febrizio were in charge of Long Beach's facilities and would be responsible for the 'cleaning and reconstruction efforts in Long Beach.' " (Pl.'s Mem. in Opp'n at 16 (citing Carroll Dep. at 42-43).) This testimony raises a genuine

question as to whether Deputy Commissioner Febrizio and Commissioner LaCarrubba were held out has having authority to contract with Servpro on behalf of the City for the work done at the facilities.[1]

## III. Plaintiff's Quantum Meruit Claim

"In order to recover in *quantum meruit*, New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994) (internal quotation marks and citation omitted).

It appears at first blush that plaintiff's *quantum meruit* claim raises material issues of fact thereby precluding the summary relief sought by the City. However, pursuant to *Jered Contracting Corp. v. New York City Transit Authority*, 22 N.Y.2d 187, 193 (1968), the New York Court of Appeals stated: "We have consistently held, primarily on public policy grounds, that, where the city fathers have deviated from the statutory mode for the expenditure of funds and letting of contracts, the party with whom the contract was made could not recover in *quantum meruit* or *quantem valebant*." Accordingly, the City argues that plaintiff is not entitled to recover in *quantum meruit* because it "has not shown compliance with New York General Municipal Law

---

[1] The City argues that plaintiff's attempts to negotiate an ESA as well as expressed need to get permission from someone with authority to continue work on the MLK Center evidence that it did not rely on the apparent authority of the City employees. Plaintiff notes, however, that according to Carroll, Servpro "requested written authorization for the restoration and remediation of the MLK Center because [it] could not get in touch with LaCarrubba or Febrizio" after having presented them with the rates on November 8, 2012. (Pl.'s Ex. G, Carroll Aff. ¶ 20.) Given these facts, the extent to which Servpro relied on the apparent authority of LaCarrubba and Febrizio is a question best left to the trier of fact.

Moreover, given that the questions of fact with respect to the apparent authority of LaCarrubba and Febrizio are sufficient to sustain plaintiff's breach of contract claims, the Court will not address plaintiff's arguments that Torres and Hodge also had apparent authority.

[("GML")] § 103, which sets forth the competitive purchasing process for municipalities located within the state," i.e., a competitive bidding process. (Def.'s Mem. in Supp. at 13.) Plaintiff, however, argues that it was not required to comply with § 103 because Superstorm Sandy created an emergency situation that fit within GML § 103[4], the emergency exception to § 103. However, in its Reply, defendant notes that pursuant to GML § 104-b, the City was required to "adopt internal policies and procedures governing all procurement of goods and services which are not required to be made pursuant to the competitive bidding requirements of section one hundred three of this article . . . ." (Reply at 7.) In other words, defendant argues that even if the emergency exception applies, the City still had to comply with its "Procurement Policy and Procedure," which provides: "Each procurement based on non-competitive proposals shall be supported by a written justification for using such procedures. The justification shall be approved by the Purchasing Agent." (Def.'s Ex. P, § III(E)(2).) Defendant points out that plaintiff has not demonstrated compliance with this provision. Accordingly, while there may be a genuine question of fact as to whether Superstorm Sandy created an emergency such that § 103[4] was applicable here, even if that provision were to apply, plaintiff has not raised any facts suggesting that the City complied with its Procurement Policy and Procedure. Therefore, plaintiff has not raised a genuine question of fact supporting its claim that the City did not deviate from the statutory mode for letting of contracts, and its claim for recovery in *quantum meruit* is dismissed.[2]

---

[2] The Court has considered cases cited by Plaintiff, *Poey v. Eggelston*, 3 Misc. 3d 543 (Civ. Ct. N.Y. Co. 2003) and *Vrooman v. Village of Middleville, Herkimer Cnty.*, 91 A.D. 2d 833 (4th Dep't 1982), stating that recovery against a municipality in quasi contract is permissible where the plaintiff "has entered into a contract in good faith, the municipality possesses the authority to enter the contract, the contract is not violative of public policy and the circumstances indicate that if plaintiff is not compensated, the municipality would be unjustly enriched." *Vrooman*, 91 A.D. 2d at 834). However since *Jered* specifically states that its rule is based on public policy grounds, the contract at issue here does not satisfy the public policy prong of the *Vrooman* test.

**IV. Damages**

Defendant provides a brief argument that to the extent it is ultimately determined that Servpro is entitled to recover for breach of contract, Servpro should not be allowed to recover for penalties it was required to pay pursuant to the New York State Department of Labor's assessment that it underpaid its workers. Similarly, defendant claims that it is entitled to an offset in damages for the amount it paid to JBH Environmental to reclean the facilities due to Servpro's substandard performance. However, because the Court finds it premature, it will not address the issue of damages at this time.

**V. Plaintiff's Claims for Accounts Stated and Breach of the Covenants of Good Faith and Fair Dealing**

As plaintiff points out, defendant has not raised any specific arguments regarding dismissal of the plaintiff's claims for accounts stated and violations of the covenants of good faith and fair dealing. Although defendant includes arguments for dismissal of those claims in its reply brief, "new arguments may not be made in a reply brief." *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999). Therefore, the Court will not entertain those arguments.

*CONCLUSION*

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part. Specifically, plaintiff's claim for recovery in quantum meruit is dismissed. However, plaintiff's remaining claims for breach of contract, accounts stated, and breach of the covenants of good faith and fair dealing remain.

**SO ORDERED.**

Dated: Central Islip, New York
September 30, 2016

/s/
Denis R. Hurley
United States District Judge